**BROKERS TITLE COMPANY, INC. and the Title Guarantee Company**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY.**

Civ. A. No. 76–1547.

United States District Court, E. D. Pennsylvania.

Jan. 26, 1979.

Paul Yermish, Philadelphia, Pa., for Brokers Title.

Reeder R. Fox, Gene Bruton, Philadelphia, Pa., for Title Guarantee.

Edwin L. Scherlis, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This case was tried before the Court sitting without a jury on July 27–28, 1978. The plaintiffs seek a declaratory judgment to the effect that certain losses they incurred are covered by a policy of insurance issued by the defendant St. Paul Fire and Marine Insurance Company.

## FINDINGS OF FACT

Plaintiff Brokers Title Company, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal office in Philadelphia, Pennsylvania. Title Guarantee Company, also a plaintiff, is a corporation organized and existing under the laws of the State of Maryland and having its principal offices in Baltimore, Maryland.

Defendant St. Paul Fire and Marine Insurance Company (St. Paul) is a corporation organized and existing under the laws of Minnesota and having its principal office in St. Paul, Minnesota.

This is an action for declaratory judgment seeking the Court's construction of the terms of an insurance policy. The amount in controversy is in excess of ten thousand dollars ($10,000) exclusive of interest and costs.

This case arises out of the same series of events which was the subject of earlier findings of fact and conclusions of law made by this Court. See *Bernard Smith and Betty Smith v. The Title Guarantee Company v. Brokers Title Company, Inc.*, C.A. 74–2710 (E.D.Pa.1977). Those findings of fact are reaffirmed and incorporated herein by reference.

Brokers Title is a title insurance company. In August of 1969, the company was handling the settlement of the sale of 42 Lee Lynn Lane in Abington Township, Montgomery County, Pennsylvania. Bernard Smith and Betty Smith were purchasing the property from Morris Smith and Mary Smith. The settlement was held on August 18th, 1969, in the offices of Brokers Title.

On the day of the settlement the president of Brokers Title, Verne Mockler, spoke to a representative of the Montgomery County Tax Claims Bureau and determined that there were real estate taxes due on the property for the years 1967 and 1968.

On September 2, 1969, Brokers Title received one thousand, nine hundred fifty-one dollars and forty cents ($1,951.40) from Morris and Mary Smith to satisfy the outstanding tax liens on the property. One of the employees of Brokers Title thereafter sent a check for $1,951.40 to the City of Philadelphia in an attempt to discharge the lien. Unfortunately, the property was located in Montgomery County, not Philadelphia, and the check was returned uncashed. By the time Brokers Title sent the check to the proper taxing authority, the property had been sold at a tax sale. The prospective purchasers, Bernard and Betty Smith, had lost the property.

In *Bernard and Betty Smith v. Title Guarantee Company, et al.*, this Court found that Brokers Title's negligence was the cause of the loss of the property, and also held Title Guarantee liable for the negligence of its agent, Brokers Title. Judgment was entered in favor of Bernard and Betty Smith and against Title Guarantee in the amount of $59,746. Brokers Title was held liable to Title Guarantee in the same amount, in a judgment entered on April 6, 1977. On July 6, 1977 this Court entered an amendment to the judgment declaring Brokers Title liable to Title Guarantee in the amount of $92,130.40. The additional $32,384.40 was added to the obligation of Brokers Title to compensate Title Guarantee Company for a payment it made to United Brokers Mortgage Company to satisfy the mortgage debt that Bernard and Betty Smith incurred before their loss of the property.

Before any of the events arising out of the 42 Lee Lane settlement, Brokers Title purchased from St. Paul Fire and Marine Insurance Company an "errors and omissions" insurance policy. That policy states: "[T]he Company agrees with the Insured

. . .

    I.  COVERAGE: To pay on behalf of the Insured . . . all sums which the Insured . . . shall become obligated to pay by reason of the liability imposed on him by law or contract for damages arising from any claim made against the Insured . . . and caused by any negligent act, error or omission of the Insured or any persons now or heretofore employed by the Insured in the performance of professional services for others in the Insured's professional capacity as Title Insurance agent . . ."

Eight exclusions from coverage were set forth in the policy. Exclusion G is the clause at issue:

"This policy does not apply

(G) To claims based upon or arising out of handling or disbursement of funds."

The policy was sold to Verne Mockler, the president of Brokers Title, by Eugene Murray, a sub-agent of St. Paul.

The evidence conflicts as to how the sale was made. Mr. Mockler testified that the agreement was made by telephone and that he did not recall that anyone discussed the exact terms or exclusions of the policy with him.

Eugene Murray testified that he went to Mr. Mockler's office and read the coverage and exclusions of the policy to Mr. Mockler, including exclusion G.[1]

The Court finds Mr. Murray's testimony to be credible. He remembers details about the meeting very well, while Mr. Mockler merely says that he cannot recall any discussions about exclusions. N.T.–1, p. 50.

Nevertheless, there is no testimony offered by either party that Mr. Murray explained the effect of the exclusions to Mr. Mockler. Mr. Murray merely said that he "went over each one [exclusion]". Murray Deposition p. 10.

The testimony is clear that Mr. Murray only read the exclusions aloud to Mr. Mockler—he did not say anything further by way of explanation: "I read it. I neither added or deleted". *Id.* p. 60. Furthermore, Mr. Mockler did not ask any questions about the policy. *Id.* p. 10.

The Court also finds that Mr. Mockler was not aware of the effects of Exclusion G, nor did he understand them. That is, he was not aware that many activities of his company (those involving handling of funds) were, in St. Paul's opinion, not covered by the errors and omissions insurance policy.

Mr. Mockler understood the construction of a typical insurance policy. He understood that there is coverage and that there are exclusions from coverage in many and perhaps most policies. However, his experi-

1. Mr. Murray became ill during the trial and his pretrial deposition was substituted for his testimony.

ence with the St. Paul errors and omissions policy was his first exposure to such coverage; and, regrettably, he did not understand its terms.

## CONCLUSIONS OF LAW

■ Two preliminary conclusions of law would perhaps clarify much of the legal discussion that is to follow. First, the exclusion in issue, taken as a whole, is not ambiguous. Ambiguous is defined by Webster's Third New International Dictionary as "having two or more possible meanings." By that standard, the exclusion is not ambiguous.

■ Second, reading the exclusions aloud to the insured established that he was aware of the language of the exclusions. The legal effect of such a presentation is the same as if the insured had silently read the policy to himself. The insured cannot rely on a defense, if one exists, that he did not read the exclusions.

■ This case presents a problem commonly encountered in federal district courts in diversity cases—that of deciding whether to acknowledge dicta by state trial and intermediate appellate courts as accurate statements of state law.[2] Here, two cases raise such issues. In *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Super. 511, 327 A.2d 363 (1974), a case involving an *ambiguous* exclusion Judge Hoffman wrote for the court:

"When a defense is based on an exception or exclusion in a policy, our Supreme Court has held that such a defense is an affirmative one, and the burden is on the defendant to establish it. *Weissman v. Prashker*, 405 Pa. 226, 233, 175 A.2d 63 (1961). Even where a policy is written in unambiguous terms, the burden of establishing the applicability of an exclusion or limitation involves proof that the insured

was aware of the exclusion or limitation and that the effect thereof was explained to him. See e. g., *Frisch v. State Farm Fire and Casualty Company*, 218 Pa.Super. 211, 275 A.2d 849 (1971); *Purdy v. Commercial Union Insurance Company of New York*, 50 D. & C.2d 230, 235 (1970)."

In *Purdy v. Commercial Union Insurance Company, supra*, cited by Judge Hoffman in *Hionis, supra*, Judge Silvestri wrote:

"[A]n exclusion to comprehensive coverage . . . is not to be enforced, even though in unambiguous terms, unless it be proved that the insured was aware of the exclusion, and that the effect of the exclusion was explained to him. The insured's intention in entering into such a contract must be proved, and the burden of proof is on the insurer . . . We do not intend to treat the individual plaintiff differently from the larger corporate plaintiff. The burden of proof, in either event, is on the party asserting the exclusion to prove not only its applicability but its understanding by the party against whom the exclusion is sought." *Purdy, supra*, 50 D. & C.2d at 235–6.[3]

Most doubts as to whether the *Hionis* case properly stated Pennsylvania law, for purposes of a diversity case, were removed by the Third Circuit in *Daburlos v. Commercial Insurance Company of Newark, New Jersey*, 521 F.2d 18 (3d Cir. 1975):

"Pennsylvania [is] a jurisdiction which treats the insured with great liberality . . . Recently, the Pennsylvania Superior Court had occasion to comment on the [insurer's] burden of proof in *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Super. 511, 516–17, 327 A.2d 363, 365 (1974):

[The court quoted the passage from *Hionis* that is quoted herein, *supra*.]

Pennsylvania, although, of course, no single lower court opinion can be presumed to reflect the correct state of the law.

---

**2.** The federal district court is, of course, required to apply state substantive law in a diversity action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As a matter of practice, this court gives considerable weight to the opinions of trial and intermediate appellate courts of the Commonwealth of

**3.** Judge Silvestri did not cite any Pennsylvania authority for the statement quoted above, but the opinion is well-reasoned and persuasive.

Thus, even if we assume Clause 3 was clear and unambiguous in the context of the policy, the defendants had the burden of establishing that the Daburloses were aware of the exclusion presented by that Clause and that its effect was explained to them. The defendants did not meet this burden of proof." 521 F.2d at 24–5.

*Hionis* was perhaps limited somewhat in a later Pennsylvania case. In *Miller v. Prudential Insurance Company of America*, 239 Pa.Super. 467, 362 A.2d 1017 (1976), the plaintiff sued his major-medical carrier to recover for bills that had already been paid by Blue Cross-Blue Shield. His argument was that Prudential's exclusion of recovery for costs covered by other benefits was not explained to him, and therefore, ineffective. The court held for Prudential on the ground that it would have been inequitable, on those facts, to make Prudential prove knowledge of the exclusion on the part of the insured. Under the circumstances, knowledge was imputed because the insured would have gained a windfall because of the insurer's failure to explain the exclusion.[4]

The central issue in this case, perhaps the sole material issue of law, is whether the Pennsylvania Courts would extend the protection of *Hionis*—that the insurer explain to the insured the effects of an unambiguous exclusion—to a buyer who happens to be a title insurance agent.

■■■ The Court does not pretend to any unusual insight into the answer to that question, but this case must be decided on some principled basis. The principles that seem applicable follow:

1. Pennsylvania is a jurisdiction which treats the insured with great liberality. *Daburlos v. Commercial Insurance Company of Newark, supra.*

2. That liberality has been extended to a sophisticated buyer (a lawyer) where the provision in issue was ambiguous. *Cadwallader v. New Amsterdam Casualty Company*, 396 Pa. 582, 152 A.2d 484 (1959).

3. The purpose of requiring explanation of the effect of an exclusion where the exclusion is unambiguous is to insure that the parties reach a meeting of minds on the intended extent of coverage before the contract is made. *Purdy v. Commercial Union Insurance Company, supra.*

Assuming that these principles are a fair statement of Pennsylvania law, this Court concludes that Pennsylvania would extend the protections of *Hionis* to Brokers Title.[5]

There are sound reasons for reading *Hionis* broadly. One who buys an insurance policy expects to be covered for certain risks. Where, as here, the coverage clause of the policy purports to offer protection against "*any* negligent act, error or omission . . . in the performance of professional services", that expectation is reinforced. After reading such a clause, the insured is not likely to expect that coverage is excluded for significant types of professional services forming a substantial part of his business.

The policy which underlies *Hionis* is the so-called "reasonable expectations rule", which has been the subject of extensive discussion among commentators. The simplest statement of the rule is that "insur-

---

4. In *Treasure Craft Jewelers, Inc. v. Jefferson Insurance Company of New York*, 583 F.2d 650 (3d Cir. 1978), the Third Circuit followed *Miller* rather than *Hionis* in a case involving awareness of an exclusion. There, however, the insured was found to be aware of the exclusion and the exact scope of coverage. In the instant case, the Court finds that Mr. Mockler did not understand the effect of the exclusion. (Cf. *Purdy, supra*, 50 D. & C.2d at 236), nor was it explained to him. Thus, *Treasure Craft, supra*, does not provide much guidance on whether *Miller* or *Hionis* supplies the proper rule of decision in this case.

5. Compare *Buckich v. Gibbs*, 1 D. & C.3d 610 (Mercer Co.1976), where the court held that the *Hionis* rule extended to a layman knowledgeable about insurance policies and exclusions (he had at times paid extra to remove exclusions). The facts of *Buckich* are somewhat stronger than those here, because there the exclusion was difficult to find. Nevertheless, the court did rule that such a purchaser was entitled to explanations of the effects of exclusions in the policy.

ance contracts should provide that coverage which one would reasonably expect upon a reading of the policy." Young, Insurance Contract Interpretation: Issues and Trends, 625 Ins.L.J. 71, 78 (Feb., 1975). Professor Keeton has advocated even more extensive protections on behalf of the insured:

> "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L. Rev. 961, 967 (1970).

Professor Keeton's suggested approach is probably not the law in Pennsylvania. There does not seem to be any legal impediment to drafting exclusions that retract coverage, for example, for 99% of the activities that come within the terms of the coverage clause, notwithstanding the expectations of the insured in seeking the broad protections of the coverage clause. But if an insurance company is to take away with the left hand much of what it offers with the right, it must carefully explain to the insured that that is what it is doing. That is the policy that is expressed in Pennsylvania insurance law as reflected in *Hionis* and *Purdy*. Otherwise, many purchasers, even those who should understand the policy but do not, will suffer unnecessary harms— harms that they might have avoided had the limitations on coverage been explained to them before purchase of the policy.

Because the effect of the exclusion at issue was not explained to the insured, and because the insured did not understand its effect, the Court concludes that coverage existed under the policy for the judgment obtained by Bernard and Betty Smith.

## DAMAGES

■ The parties disagree as to whether a declaration that coverage exists would subject St. Paul to liability under the policy of $58,746.00 or $91,130.40.

The policy in issue says that St. Paul shall "pay on behalf of the Insured . . . all sums which the Insured . . . shall become obligated to pay by reason of the liability imposed on him by law . . ."

Title Guarantee paid $32,384.40 to United Brokers Mortgage Company to satisfy the mortgage that United Brokers held on 42 Lee Lynn Lane at the time of the tax sale. By Order dated July 6, 1977, this Court included that $32,384.40 in the amount that Brokers Title owed Title Guarantee for indemnity. The issue is whether, assuming St. Paul is liable, Brokers Title should be able to collect that $32,384.40 from St. Paul.

St. Paul argues that the policy does not require payment of an obligation until the amount of the obligation "shall have been finally determined by judgment against the Insured after actual trial . . ." St. Paul suggests that the Order of July 6, 1977, is not a proper judgment, primarily because Title Guarantee did not plead a right to indemnity as to the "extra" $32,-384.40.

The Court agrees with the argument of Title Guarantee that "if [St. Paul] had come in and defended Brokers, [it] could have made all those arguments. They elected not to." N.T.–1, p. 28. Even assuming that the Court was completely wrong in its assessment of damages, Brokers Title was still obligated to pay whatever amount the Court awarded Title Guarantee. The Order of July 6, 1977, was an amendment to the *judgment,* and says so on its face. St. Paul cannot argue at this point that it was not properly entered.

St. Paul was bound by Part III of the policy to "Defend . . . any suit against the Insured alleging such negligent act, error or omission and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . ." The Smith's suit alleged such an act. St. Paul's decision not to defend was made at its peril, and it cannot now challenge the judgment against its insured. *Renschler v. Pizano,* 329 Pa. 249, 254, 198 A. 33 (1938); *Commonwealth ex ex rel. Woodside v. Sea-*

*board Mutual Casualty Company,* 415 Pa. 72, 202 A.2d 42 (1964).

■ The Court's finding that St. Paul breached its contractual duty to defend also settles the issue of liability for counsel fees. It is well settled that counsel fees are one element of damages recoverable for breach of the duty to defend. *Gedeon v. State Farm Mutual Auto Insurance Co.,* 410 Pa. 55, 188 A.2d 320 (1963).[6]

Counsel have stipulated that if counsel fees are awarded in this suit that the amount recoverable should be $7,500.

■ Although this is a suit for a declaratory judgment, the Court is permitted to award money damages, especially where such an award is likely to obviate the need for further litigation on the judgment. *Beacon Construction Company, Inc. v. Matco Electric Company, Inc.,* 521 F.2d 392 (2d Cir. 1975); *Hudson v. Hardy,* 137 U.S.App. D.C. 366, 424 F.2d 854 (1970); *Freed v. Travelers,* 300 F.2d 395 (7th Cir. 1962). Giving effect to the $1000 deductible clause in the policy, the Court finds that Brokers Title is entitled to recovery in the amount of $98,630.40.[7]

The clerk will enter judgment in favor of Brokers Title Company, Inc. in the amount stated, and in favor of Title Guarantee Company on the issue of liability.

---

6. The Court expresses no opinion as to whether St. Paul would have had a duty to defend in this case if the Court had decided that St. Paul had no duty to indemnify.

7. Because Title Guarantee was not a party to the contract in issue, and because the Court has not heard sufficient evidence on the issue of what damages Title Guarantee has suffered because of the breach, the Court will not award damages to Title Guarantee. Title Guarantee may, of course, pursue in another proceeding (if it wishes) any rights it may have gained because of the declaratory judgment in its favor.