649 F.Supp. 130 (1986)
ROYAL INSURANCE CO. (U.K.) LTD.
v.
IDEAL MUTUAL INSURANCE COMPANY
and
Global Aviation Insurance Managers, Inc.
and
Corroon and Black Corporation.
Civ. A. No. 84-4741.
United States District Court, E.D. Pennsylvania.
March 31, 1986.
*131 William R. Solvibile, Anton H. Rosenthal, Philadelphia, Pa., for plaintiff.
J. Bruce McKissock, Philadelphia, Pa., for defendant.

MEMORANDUM OF DECISION
McGLYNN, District Judge.
This action arises out of a dispute between a reinsurer and a primary insurer over the terms of an aviation insurance policy. In March of 1981, Hortman Aviation sought to obtain coverage for a Piper Navajo aircraft it had recently purchased. Hortman contacted Global Aviation Insurance Managers, Inc., which was authorized to place aviation insurance on aircraft using a policy issued by Ideal Mutual Insurance Co. Because the value of the Navajo exceeded the treaty limits under which Global was authorized to place coverage, Global arranged a facultative placement of the coverage with Royal in the London insurance market. Thereafter, Global issued an All-Risks policy for the Navajo that was 100% reinsured by Royal in the London market.
In July of 1981, Hortman agreed to permit Earl Vincent, a qualified pilot, to take *132 the Navajo to Tennessee for a flight demonstration. The aircraft never arrived in Tennessee and was last seen in Miami on July 23, 1981. Neither Vincent nor the aircraft has been located since.
Hortman subsequently reported the loss to Global. In the fall of 1981, Royal initiated an action for a declaratory judgment to determine the rights and liabilities of the parties under the All-Risks policy for the Navajo. Before judgment was entered, the parties agreed to settle the claim for the sum of $227,500.00. Royal paid the claim in October of 1983.
Royal now maintains that the loss of the Navajo was not covered by the All-Risks policy that it had reinsured and seeks reimbursement of the $227,500.00 from Global and Ideal. The matter was tried to the court sitting without a jury. After consideration of the evidence and the briefs and arguments of counsel, the court makes the following

FINDINGS OF FACT
1. Royal Insurance Co. (U.K.) Ltd. ("Royal") is a company engaged in the business of underwriting insurance policies with its registered office located at New Hall Place, Liverpool, England, and is a citizen of England.
2. Defendant Ideal Mutual Insurance Company ("Ideal") is a New York corporation with its principal place of business at 260 Madison Avenue, New York, New York.
3. Global Aviation Insurance Managers, Inc. ("Global") is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 3000 Promenade Center, Richardson, Texas, and is a wholly owned subsidiary of the Corroon and Black Corporation with its principal place of business at Wall Street Plaza, New York, New York.
4. In March of 1981, Hortman Aviation, Inc. ("Hortman"), was an aviation fixed base operator which owned and operated aircraft, including the rental of aircraft to others, with its principal place of operations based at the Three M Airport, Bristol, Pennsylvania.
5. In March of 1981, Hortman owned and/or operated a fleet of approximately 18 aircraft, which included a 1980 Piper Navajo Aircraft ("the Navajo"), model PA-31-350, FAA registration # N3546U.
6. In March of 1981, Hortman sought to obtain hull and liability insurance for all 18 of its aircraft, which insurance was placed with Global by Mr. Charles Billella, Hortman's insurance broker, through the services of Mr. Russ Levin, a cooperating broker.
7. Global is not an insurance company, but was authorized pursuant to a treaty with certain aviation underwriters to place aviation insurance on aircraft using a policy issued by Ideal, subject to certain limitations on coverage.
8. In 1981, the Treaty Insurance limits that existed between the aviation underwriters and Global included a maximum hull insurance on any one aircraft of $250,000.
9. As of March, 1981, the declared value of the Piper Navajo aircraft owned by Hortman was $297,000, which was in excess of the Treaty's hull limit.
10. In order for Global to provide hull insurance to Hortman on the Navajo, it was necessary for Global to arrange a facultative (special) placement of that coverage with Royal.
11. When Mr. Levin, the intermediate broker, contacted Global, he requested a commercial type aviation All-Risks policy for the Hortman fleet with a blanket breach of warranty endorsement.
12. Mr. Levin understood this request for a blanket breach of warranty endorsement to apply to all eighteen (18) aircraft operated on behalf of Hortman; however, there was no separate discussion regarding a specific breach of warranty endorsement for the Piper Navajo.
13. Thereafter, Global issued two insurance policies to Hortman which bore policy numbers AHL-030738 and AHL-030221.
*133 14. Policy AHL-030738, which was issued under the treaty, provided liability coverage for all eighteen (18) aircraft in the Hortman fleet and hull insurance for all of Hortman's aircraft except for the Piper Navajo. It also contained a blanket breach of warranty endorsement which extended the hull coverage to the lienholders of any of the 17 aircraft which were subject to financing.
15. Policy AHL-030221 provided facultative insurance coverage, so that the policy was 100% reinsured in the London insurance market, and provided hull insurance only for the Piper Navajo aircraft.
16. Policy AHL-030221 did not include a breach of warranty endorsement ("BOW").
17. Global did not request a BOW endorsement on the Navajo as part of the facultative placement in London.
18. Global, nonetheless, sent a telex to Piper confirming the fact that BOW coverage had been issued on the entire Hortman fleet of aircraft.
19. The telex was prepared by Sharon Guyton, an underwriting assistant at Global, in her capacity as an employee at Global, and Global expected Piper to rely on the telex.
20. Both insurance policies were All-Risks policies in which underwriters agreed to indemnify Hortman for any loss or damage to any of its aircraft during the policy, if such loss was not specifically excluded by the terms and conditions of the policy.
21. Exclusion 8(f) of policy AHL-030221 provided that the policy would not apply under coverage G ("All Risks While in Motion"). ... "(f) while the aircraft is subject to bailment, lease, conditional sale, mortgage or other encumbrance not specifically stated in the Declarations."
22. Both insurance policies utilize the same policy form and contain the same printed provisions for terms and conditions of coverage.
23. At all times relevant to this litigation, and specifically during July 1981, policy AHL-030221 providing All-Risks hull insurance for the Navajo was in effect.
24. The Navajo was listed on various monthly reporting forms submitted on behalf of Hortman to Global.
25. Premiums were computed and charged to Hortman based on the reporting forms for two months prior to the loss of the Navajo.
26. Prior to and during July 1981, Hortman had been attempting to sell the Piper Navajo aircraft.
27. Prior to July 1981, Hortman had become acquainted with a Mr. Earl Vincent, who was a qualified and experienced pilot and who operated a charter aviation company known as Mercury Aviation.
28. At some time prior to July 22, 1981, Vincent advised Hortman that he had a potential buyer located somewhere in Tennessee who was interested in acquiring the Navajo.
29. Yvette Hortman, on behalf of Hortman Aviation, authorized Vincent to take the Navajo to Tennessee to show the aircraft to the potential buyer.
30. Vincent had permission to take the Piper Navajo for this flight demonstration and was acting for Hortman for the purpose of conducting such a demonstration.
31. There was no charge to Vincent or remuneration to Hortman with regard to the proposed demonstration flight for the prospective buyer in Tennessee.
32. Mr. Vincent met the pilot warranty clause contained in policy AHL-030221.
33. The Navajo never arrived in Tennessee but was sighted in Miami, Florida on or about July 23, 1981, where it stopped to refuel, and Vincent was identified as the pilot who was operating the aircraft at that time.
34. The Navajo departed from Miami on that date and neither Vincent nor the Navajo has been seen or located since that date.
35. In accordance with the provision of paragraph G of the All-Risks policy, the Navajo has been missing for more than sixty days and is, therefore, deemed a total loss.
*134 36. Prior to the loss, Vincent had rented the aircraft from Hortman on previous occasions and had followed a pattern of dealing where he always brought the plane back.
37. In or about August 1981, representatives of Hortman advised Global that the Navajo was missing and presumed lost. At that time, Global assigned Mr. Don Lee, president of Aviation Marine Services, Inc., an aviation claims investigator, to investigate the disappearance of the Navajo.
38. In the fall of 1981, the London underwriters appointed John Tigert, VI, Esquire, to initiate a declaratory judgment action to determine whether or not the loss of the Navajo was covered by policy AHL-030221.
39. Tigert informed Global that coverage could possibly be denied under exclusion 8(f) of the policy because a bailment had occurred.
40. Tigert also advised Global that Piper could claim that a breach of warranty endorsement was issued by Global in light of the telex it sent to Piper, and unless conversion could be established, Global would be responsible for payment under this endorsement.
41. As a result of the loss, an action was instituted by Piper against Global and Ideal to recover their lineholder's interest.
42. In or about June of 1983, representatives of Royal and Global met in London to discuss the possible settlement of the claims asserted by Hortman and Piper.
43. In or about July of 1983, the parties agreed to settle the claims of Piper and Hortman for $227,500.00.
44. Royal paid Piper the $227,500.00 on or about October 4, 1983.
45. At this time, Hortman Aviation, Yvette Hortman, Piper, Global and Royal entered into a release in which Piper released Hortman from all sums due in return for the right to receive all monies paid under the settlement agreement. Royal did not reserve the right to pursue any claim relating to the disappearance of the Navajo in that release.
46. There was no resolution at that meeting as to whether the loss of the aircraft was covered under the All-Risk policy that was reinsured by Royal.
47. The parties disagree as to whether the participants at the meeting agreed to hold further discussions as to whether the claims were covered under the All-Risk policy and, thus, as to whether Royal is entitled to be reimbursed by Global and Ideal.

DISCUSSION
The central issue for resolution in this dispute is whether the loss of the Navajo was covered by the All-Risks policy that was 100% reinsured by Royal, or whether it was specifically excluded by a term or condition of that policy. Plaintiff argues that the loss of the aircraft was not covered by the policy because the aircraft was subject to a bailment when it disappeared, and coverage is explicitly excluded in that situation by 8(f) of the policy. Defendants do not dispute that Vincent's use of the aircraft constituted a common law bailment, but argue that exclusion 8(f) was only intended to apply in those situations where the aircraft was subject to a financial encumbrance that affected the ownership of the aircraft. As such, defendants contend that the phrase should be read as "bailment lease," which has long been recognized in Pennsylvania as a vehicle for structuring the lease purchase of chattel. See, General Motors Acceptance Corp. v. Hartman, 114 Pa.Super. 544, 174 A.2d 795 (1934). For the reasons which follow, I conclude that the exclusion was intended to have the effect assigned to it by the defendants.
As an initial matter, Royal argues that the language of the exclusion is clear and unambiguous and resort to rules of contract interpretation and construction is, therefore, not only unnecessary but improper. It is well settled that rules of construction and interpretation should not be employed where the language of a contract is unambiguous. Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174 (3d Cir.1979). A consideration *135 of both the language of the provision and the contract as a whole, however, convinces me that there is indeed an ambiguity in the policy that necessitates application of the rules of contract interpretation, for the disputed language is susceptible of two drastically different interpretations depending on whether the comma between "bailment" and "lease" is given effect.
Exclusion 8(f) provides that the policy will not apply while the aircraft is subject to a "bailment, lease, conditional sale, mortgage or other encumbrance not specifically stated in the Declarations." Both a conditional sale and a mortgage are financial encumbrances that affect the title of an item, while a bailment and lease only involve the use of the aircraft and do not affect the ownership. Under the rule of ejusdem generis, contract language must be read in context, and general terms following an enumeration of specific terms should be construed with reference to the specific terms. Affiliated Food Distributors, Inc. v. Local Union No. 229, 483 F.2d 418 (3d Cir.), cert. denied, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1973); In re Alloy Mfg. Co. Emp. Trust, 411 Pa. 492, 192 A.2d 394 (1963). In addition, any doubt as to the meaning of a specific term in an enumeration should be resolved by reference to the other specific terms in the group or class.
When the language in question is read in conjunction with the other specific terms in the provision, it becomes clear that no effect should be given to the comma and the phrase should be read as "bailment lease." Under this interpretation, all of the terms in the provision would be of the same type or class; i.e., encumbrances that affect the title of the aircraft. Under Royal's construction, the specific terms in the enumeration would not be members of the same specific class or group, making it much more difficult to ascertain just what "encumbrances" would be excluded from coverage. This surely was not the intent of the drafters.
A consideration of the policy as a whole also supports this interpretation, for it is evident from a reading of the other provisions in the policy that the exclusion was not intended to avoid coverage any time the aircraft was subject to an ordinary bailment or lease. Indeed, such a construction would cause exclusion 8(f) to conflict with both the "Purposes of Use" section and the "Open Pilot Warranty Clause" of the policy. As it is well established that provisions in a contract should not be construed so as to create a conflict or render a section ineffectual, this construction should be avoided. See, Law v. Reading Co., 312 F.2d 841 (3d Cir.1963); International Organization Masters, Mates, and Pilots of America, Local No. 2 v. International Masters, Mates and Pilots of America, Inc., 497 Pa. 102, 439 A.2d 621 (1981).
The "Purposes of Use" section is part of the preprinted form utilized by Ideal in all of the policies it issues. This section contemplates seven different types of usage, including rental and commercial use. The policy for the Navajo states that the aircraft could be used for "Pleasure and Business" and "Industrial Aid," but not for instruction or rental to others.[1] Although the policy prohibited rental of the Navajo, the Purposes of Use section, by its very terms, contemplates rental to third parties and operation of an aircraft in a bailment situation. As every policy issued by Ideal also contains the same exclusion section, including exclusion 8(f), it could not have been the intent of the parties to exclude coverage in all situations where the aircraft was leased to others or was subject to an ordinary bailment.
*136 This conclusion is buttressed by the fact that the All-Risks policy for the other seventeen aircraft in the Hortman fleet, which contains the same standard provisions as the policy for the Navajo, specifically permits the aircraft to be used for rental and other commercial purposes. See, Purposes of Use section, Policy AHL-030738. Thus, the disputed language could not have been intended to exclude coverage when the plane was subject to a bailment or lease because such usage of the aircraft was expressly authorized by this other provision in the policy, and it would be anamolous to construe the policy so as to prohibit in one section what it specifically sanctions in another. Moreover, although the policies differ in that the All-Risks policy for the Navajo did not permit rental to third parties, the patent inconsistency in the other policy underscores the fact that exclusion 8(f) was not intended to exclude coverage while any of the aircraft were subject to a bailment or lease unless this intention was expressed in the Purposes of Use section of the policy.
The exclusion would also conflict with the Open Pilot Warranty Clause under Royal's interpretation. This clause specifies the minimum qualifications a pilot must have in order to operate the Navajo under the terms of the coverage. It clearly contemplates operation of the Navajo in bailment situations, as it indicates that third parties may operate the aircraft as long as the pilot meets or exceeds the specified qualifications. If the exclusion is read as Royal urges, the Open Pilot Warranty clause would have little meaning, because just about any operation of the aircraft by a qualified pilot who met the warranty clause but who was not an employee of Hortman would constitute a common law bailment. If the clause was meant to restrict operation of the aircraft to employees of Hortman, it should say so.
On the other hand, if coverage is only excluded in situations where the aircraft is subject to a "bailment lease," the language of exclusion 8(f) would not only be internally consistent, but the provision would complement rather than conflict with these other provisions in the policy. Under this interpretation, both the Purposes of Use section and the Pilot Warranty Clause would be given full effect rather than gutted by the exclusion.
Finally the evidence showed that it was the custom of the industry to pay claims under All-Risk coverage in many bailment situations. It is well established that evidence of customary practice in the particular insurance industry is probative of the intent of the parties to an insurance contract. Harbor Insurance Co. v. Lewis, 562 F.Supp. 800 (E.D.Pa.1983). Various underwriters for the plaintiff have admitted that it was their policy to pay hull losses in situations where aircraft were damaged while subject to bailments under the language used in the All-Risks policy.[2] Even John Tigert, an aviation insurance specialist and plaintiff's principal witness, conceded that a properly qualified pilot who was not employed by Hortman but who was demonstrating an aircraft on Hortman's behalf, would be within the All-Risks coverage if the aircraft was damaged or lost in flight. (N.T. 253-256). Tigert's ultimate conclusion that the loss of the Navajo was not covered because the plane was subject to a bailment loses much of its force in light of this admission, as the parties are in agreement that Vincent was "acting for Hortman" in conducting the flight demonstration. (J.S.F. 22)[3]
The defendants have also introduced copies of aviation policies issued by three other companies containing language similar to that used in the All-Risks policy that help shed light on industry practice. Two of those policies  those issued by Avemco Insurance Co. and the United *137 States Aircraft Insurance Group  exclude any loss while the aircraft is subject to a "bailment lease, conditional sale, mortgage, or other encumbrance." The third policy, that issued by the United States Aircraft Insurance Group, excludes coverage while the aircraft is subject to any "lien, conditional sale, mortgage or other encumbrance." While this evidence is less probative of the intent of the parties with regard to the All-Risks policy, it does lend some support to the defendants' claim that it was the intent of the parties to exclude coverage in situations where the Navajo was subject to an encumbrance and that the comma was therefore included by mistake. Although the defendants do not offer a satisfactory explanation for the placement of the comma,[4] and it is normally true that any ambiguity resulting from the deliberate choice of language will be most strictly construed against the party that drafted the contract, In re F.H. McGraw & Co., 473 F.2d 465 (3d Cir.), cert. denied, 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312 (1973), application of this rule in this situation would be improper given the strong evidence supporting an interpretation to the contrary. Moreover, although punctuation is often used as an aid in contract interpretation, it should not be permitted to control a meaning which is evident from a consideration of the policy as a whole.
Accordingly, both the language of the exclusion and a consideration of the entire policy convinces me that exclusion 8(f) was intended to exclude coverage in situations where the aircraft was subject to a "bailment lease" or other type of financial encumbrance. As such, the loss of the Navajo was covered by the All-Risks policy and Royal correctly paid the sum of $227,500.00 in settlement of the claim brought against the parties under the terms of the policy.
Because I have determined that the loss of the Navajo was covered by the All-Risks policy, it is unnecessary to determine whether a breach of warranty endorsement was issued by Global in favor of Piper. Nevertheless, even if a BOW endorsement attached to the Navajo by virtue of Global's telex to Piper dated May 6, 1981, payment could not have been made under this endorsement because it specifically excludes coverage if the aircraft has been converted while in the possession of a person other than the named insured, and the facts establish that the aircraft was converted by Vincent.
Under Pennsylvania law, a conversion has been defined as the "deprivation of another's right of property in, or use or possession of, a chattel, or other interferences therewith, without the owner's consent and without lawful justification." Welded Tube Co. of America v. Phoenix Steel Corp., 512 F.2d 342 (3d Cir. 1975); Baker v. Rangos, 229 Pa.Super. 333, 324 A.2d 498 (1974). It is undisputed that Vincent was given permission to take the Navajo to Tennessee for a few days in order to conduct a flight demonstration. (J.S.F. 21). It is also undisputed that the Navajo never arrived in Tennessee, but was sighted in Miami, Florida on July 23, 1981, and neither Vincent nor the Navajo has been located since. (J.S.F. 2). Where, as here, it is established that the property in question was delivered for a particular purpose, and for a limited period of time, and it was then used by the holder in an inconsistent manner and was never returned, a conversion is established as a matter of law. See, e.g., Knuth v. Erie-Crawford Dairy Co-Operative, 463 F.2d 470, cert. denied, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278, on remand, 58 F.R.D. 646, aff'd 487 F.2d 1394 (3d Cir.1972); Gottesfeld v. Mechanics & Traders Ins. Co., 196 Pa.Super. 109, 173 A.2d 763 (1961).
Royal argues that a finding of conversion is precluded because there is no proof that Vincent intentionally exercised *138 wrongful dominion or control over the Navajo given the pattern of prior dealings between Vincent and Hortman, and there was no evidence of continued usage after the plane was lost. This argument is without merit. The fact that Vincent had rented the aircraft from Hortman on prior occasions and he had always returned the aircraft on these occasions does not establish that Vincent had permission to fly the Navajo to Miami in the situation at hand. It is undisputed that there was no discussion between Mrs. Hortman and Vincent regarding the use of the aircraft for any purpose other than the flight demonstration in Tennessee, and that there was no charge to Vincent or remuneration to Hortman in connection with the flight. (J.S.F. 23, 24).
Moreover, the fact that neither Vincent nor the Navajo has ever been located and that it is uncertain whether the plane was destroyed or Vincent continued to use it after its disappearance does not preclude a finding of conversion, because the conversion occurred simply by virtue of the fact that the aircraft was taken to Miami without the owner's consent and never returned to the owner, thus depriving Hortman of its possessory rights in the plane. Even if Vincent intended to take the plane to Tennessee after he left Miami and it was somehow lost en route, a conversion has been made out because his use of the plane was inconsistent with the purpose for which he was given the aircraft.
In sum, even if a BOW endorsement was found to exist, no payment would have been required under the endorsement because of the conversion by Vincent, and any payment under the provision would be deemed that of a volunteer. See, e.g., Rocco v. Johns-Manville Corp., 754 F.2d 110 (3d Cir.1985); Michigan Millers Mutual Ins. Co. v. U.S. Fidelity & Guaranty, 306 Pa.Super. 88, 452 A.2d 16 (1982).
Accordingly, I arrive at the following

CONCLUSIONS OF LAW
1. Jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship of the parties.
2. Pennsylvania law applies to the issues being litigated between plaintiff and defendant in this matter. Melville v. American Home Assurance Co., 584 F.2d 1306 (3d Cir.1978).
3. In this insurance coverage dispute, the burden is upon the party seeking to avoid coverage to prove that the loss does not come within the policy issued by that insurer; in this instance, plaintiff Royal Insurance has the burden of proving by a preponderance of the evidence that the underlying claim by Hortman did not come within the All-Risks coverage provided under policy AHL-030221. Weissman v. Prashker, 405 Pa. 226, 175 A.2d 63 (1960).
4. As I have determined, for the reasons stated above, that the loss of the Navajo was covered by the policy, plaintiff Royal Insurance has failed to carry its burden of proving that the underlying claim by Hortman Aviation did not come within the All-Risks coverage.

ORDER
AND NOW, this 27th day of MARCH, 1986, upon consideration of the evidence introduced at trial and based upon the foregoing findings of fact and conclusions of law, it is

ORDERED
that JUDGMENT is hereby entered in favor of the defendants Global Aviation Insurance Managers, Inc., Ideal Mutual Insurance Co., and Corroon and Black Corp. and against the plaintiff Royal Insurance Co. (U.K.) Ltd.
NOTES
[1] The policy defines "Pleasure and Business" as "[P]ersonal and Pleasure use and use in direct connection with the insured's business, excluding any operation for which a charge is made." The category entitled "Industrial Aid" includes the uses specified in the above section and also permits the Navajo to be used for the "transportation of executives, employees, guests and customers, excluding any operation for which a charge is made." The policy indicates that the Navajo may also be used for the "transportation of passengers and or freight for hire but excluding any use of the aircraft for instruction or rental to others."
[2] Both John Coquet and David Eames, who are underwriters for Royal, have stated that it was their policy to pay hull losses in ordinary bailment situations under the language used in the policy. See, Deposition of Coquet at 14, 18; Deposition of Eames at 35, 17 and N.T. 206.
[3] "J.S.F." refers to the Joint Stipulation of Facts entered into by the parties.
[4] In their Pre-Trial Memo and Brief, the defendants assert that the comma was inserted by mistake but maintain that "there is no present explanation as to how the comma became inserted in this form." Defendants' Pre-Trial Memo at 8. The defendants also state that the term "bailment lease" was used in the original form of the policy, but have not annexed a copy of this form to the record.