Jasper DI SANTO

v.

**ENSTROM HELICOPTER CORPORA-TION, Defendant and Third Party Plaintiff and Southern Marine and Aviation Underwriters, Inc., Defendant and Manhattan Fire and Marine Ins. Co., Defendant,**

v.

**Robert DI SANTO, Lanes Valley Forge Aviation, Inc., and Thomas H. Kilrain, III, Third Party Defendants.**

Civ. A. No. 77–1063.

United States District Court,
E. D. Pennsylvania.

May 20, 1980.

As Amended May 23, 1980.

Arthur Alan Wolk, Philadelphia, Pa., for plaintiff.

J. Bruce McKissock, Lise Luborsky, Duane, Morris & Heckscher, Philadelphia, Pa., for moving defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT

#### A. *Introduction*

This case requires us to construe a contract of aircraft insurance. It arises from a helicopter accident which occurred on July 20, 1976, when a helicopter owned by plaintiff Jasper DiSanto (DiSanto) crashed from

an altitude of approximately 15 feet during a test flight while being piloted by an aircraft mechanic. The helicopter, an Enstrom F28A, was totally destroyed in the crash. Plaintiff brought this action against Enstrom Helicopter Corporation (Enstrom), the manufacturer of the helicopter, and against his insurers, Southern Marine and Aviation Underwriters, Inc. (Southern) and Manhattan Fire and Marine Insurance Company (Manhattan).[1] Enstrom filed a third-party complaint against the plaintiff's son, Robert DiSanto, who was the copter's regular pilot, and against two other third-party defendants.[2] Subsequently, Robert DiSanto filed his own third-party complaint against Southern and Manhattan.[3] Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332, and the parties agree that the case is governed by Pennsylvania law.[4]

The case is before us on the motion of Southern and Manhattan for summary judgment against the plaintiff, and the motions of Jasper and Robert DiSanto for summary judgment against Southern and Manhattan on their complaint and third-party complaint, respectively.[5] We will reserve decision on the motion of third-party plaintiff Robert DiSanto, as his motion has not been adequately briefed. See n. 3, supra. For the reasons set forth below, we will grant Southern and Manhattan's motion for summary judgment, and deny plaintiff's motion.

B. *The Material Facts*

The material facts, which are undisputed, are as follows. At the time of the accident, Jasper DiSanto was the named insured under the defendants' policy No. H–5–1873, issued on July 1, 1976, for a policy period which began on June 22, 1976. The policy includes "Coverage F," also known as "Hull Coverage," by which the insurer agrees

1. Southern was the insurance carrier and negotiated the policy with plaintiff's insurance broker, while Manhattan issued the policy. Since both Southern and Manhattan have joined in the present motion, we have no occasion to distinguish between them and refer to them collectively as "defendants" or "the insurers."

2. In addition to Robert DiSanto, Enstrom named as third-party defendants Lane's Valley Forge Aviation, Inc., the aircraft repair shop upon whose premises the accident occurred, and Thomas H. Kilrain, III, the pilot of the craft at the time of the crash. Enstrom alleged that any damages to the helicopter were the result of negligent acts and omissions of the third-party defendants with respect to the maintenance, servicing, inspection, testing, repair, and/or operation of the helicopter, and that the third-party defendants were liable over to Enstrom for any damages awarded to the plaintiff.

3. The gravamen of Robert DiSanto's third-party complaint against Southern and Manhattan is that the defendants failed to provide him with a legal defense to the third-party complaint filed against him by Enstrom, although they were obligated by the terms of an insurance policy to defend him and he requested that they do so. Robert DiSanto seeks to recover the cost to him of defending against Enstrom's third-party complaint, i. e. attorney's fees, and punitive damages. In their briefs sur the present motions, the parties have devoted little attention to Robert DiSanto's motion. While the material facts may be undisputed, there are at least two legal issues which are disputed: whether the policy, properly interpreted, afforded coverage of the type he claims to Robert DiSanto, and whether DiSanto waived any right to have his defense provided by the insurer by independently retaining counsel after the insurer failed to act on his request. In the absence of more substantial briefing of these issues, we reserve decision on Robert DiSanto's motion. Since we will grant summary judgment for Southern and Manhattan against the plaintiff Jasper DiSanto, Robert DiSanto's claim against those defendants will be the only one remaining in the case. See n. 5, infra.

4. DiSanto is a Pennsylvania citizen while Enstrom, Southern, and Manhattan are Michigan, Louisiana, and New York corporations, respectively, and citizens of those states. The accident which gave rise to this action occurred at the Perkiomen Valley Airport in Collegeville, Pennsylvania. The insurance policy which is the subject of the present motions was negotiated by the plaintiff's insurance broker, Harlan, Incorporated of Pennsylvania, in Philadelphia, and Southern's office in Atlanta, Georgia.

5. All claims against Enstrom and all claims made by Enstrom as third-party plaintiff have been settled and have been dismissed or discontinued by stipulation of counsel. The claims of plaintiff Jasper DiSanto and third-party plaintiff Robert DiSanto against Southern and Manhattan, which are the subjects of the pending summary judgment motions, are the only claims remaining in the lawsuit.

"[t]o pay for any direct physical loss of or direct physical damage to the aircraft" up to the amount of $50,000, with $250 deductible for damage while the rotors are not in motion, and $2500 deductible for damage while the rotors are in motion. Item 10 of the policy declarations provides as follows:

Pilots–The coverage afforded by this policy shall not apply unless the aircraft is operated in flight by the pilots endorsed hereon and then only provided said pilots are qualified in accordance with the terms of the endorsement(s).

Under the heading "Exclusions," the policy provides as follows:

This policy does not apply and no coverage is afforded:

. . . . .

2. To any insured while the aircraft is in flight:

(a) If piloted by other than the pilot or pilots designated in the Declarations or endorsed hereon[.]

Under the heading "Pilot Qualification Endorsement," the policy provides as follows:

When in flight the aircraft shall be operated only by the pilot(s) designated below . . . . :

Robert DiSanto . . .

Any other pilot, provided he has a Commercial Pilots Certificate with Rotorcraft Rating and has a minimum logged flying time of 500 hours as pilot in command of rotorcraft, of which 50 hours shall have been in same make and model as being flown.

Certain other clauses in the policy are relevant to the plaintiff's contention that the policy is ambiguous and will be discussed in detail when we address that contention.

This policy resulted from negotiations during the month of June 1976, between Susan Trahey of Harlan, Incorporated of Pennsylvania (Harlan), plaintiff's insurance broker, and Jim Harris, an employee of Southern. After requesting and receiving a quote from Southern for a new insurance policy, Trahey sent to Harris on June 22 a telex which read in pertinent part as follows:

Re Jasper Di Santo . . .
Pl Bind Eff 6/22/76 Per Your Quote:
Liability 1M CSL Including Passenger $975
Hull All Risks Valued Form-Ded 250/2000 $2750
Total Annual Premium $3725
Will Transmit Our Binder and Request Completed Appl From Insured

The notation "Ded 250/2000" meant that the proposed hull coverage would include $250 deductible for damage occurring while the craft was not in motion and $2000 deductible for damage while in motion. Harris responded by telex of June 23, saying:

This is to confirm that we have bound all as per your tel June 22.

On June 22, Trahey also completed an "Insurance Order Form" which provided, *inter alia*, that the desired hull coverage include $2000 in-motion deductible. The order form also included the following statement with respect to pilots:

PILOTS: Robert Di Santo and/or any private or better certificated pilot who has a minimum of 300 total logged flying hours in Rotary-Wing Aircraft of which not less than 15 hours shall have been in make and model being flown.

COMPLETED PILOT DATA AND APPLICATION WILL BE FORTHCOMING (capitals and emphasis in original). On June 23, Jasper DiSanto signed his "Aircraft Application," in which he stated that Robert DiSanto had 400 hours of flight experience.

On July 1, Harris transmitted the policy to Trahey, with a cover letter which stated:

Please refer to Endorsement No. 1 (Pilot Qualification Endorsement) and note that we have named Robert DiSanto as an approved pilot and also we have provided you with an open pilot warranty which requires a pilot having a Commercial Pilot Certificate with Rotorcraft Rating and has a minimum logged flying time of 500 hours as pilot in command of rotorcraft of which 50 hours shall have been in same make and model as being flown. This open pilot warranty is different from the one on your binder of June 22nd, so please review this with the Insured in order that we will not have any

misunderstanding as respects any pilots that may fly this rotorcraft.

On July 12, Trahey transmitted the policy to the plaintiff, with a cover memorandum which said:

Please note the pilot requirements are different from the ones outlined on our binder. We apologize for this error and hope it hasn't caused you any inconvenience.

On July 20, 1976, Robert DiSanto brought the helicopter to the premises of Lanes Valley Forge Aviation, Inc., in Collegeville, Pennsylvania, for tests because he was concerned about a vibration in the craft. He delivered it to Thomas H. Kilrain, III, an FAA licensed helicopter mechanic and pilot who was an employee of Lanes. Kilrain examined the craft and began a flight test to determine the cause of the vibration. While Kilrain was flying the helicopter at an altitude of approximately 15 feet, the rotor separated from the body of the craft, which crashed. Kilrain did not meet the description of "any other pilot" in the Pilot Qualification Endorsement, since he had less than 200 hours flight experience in helicopters, less than 20 hours flight experience in an Enstrom F28, and held only a private pilot's certificate instead of a commercial pilot's certificate. Kilrain's failure to meet the policy description had no causal connection whatsoever to the accident. Plaintiff promptly notified the insurers of the accident, but on September 20, 1976, Southern informed him through its agents, Peter J. McBreen & Associates, Inc., that coverage was denied. The sole basis for the denial was Kilrain's failure to meet the terms of the Pilot Qualification Endorsement.

In December of 1977, during the pendency of this lawsuit, plaintiff's insurance broker, Harlan, contacted Southern and requested that it return the unearned portion of DiSanto's premium. The policy provides:

25. CANCELLATION. . . . The company shall not be liable for any return premium with respect to an aircraft on which a total loss has been paid.

The plaintiff interprets this provision to require the return of the unearned portion of the premium for DiSanto's policy, since in his view the aircraft was a total loss but the insurers paid nothing. Bill Brokaw of Southern replied to Harlan's request by telex of December 5, 1977:

I have checked and find that this loass [sic] is currently being litigated. Any return premium will have to wait pending the final outcome of the case. I will keep a suspense and compute any return due as soon as possible.

In November 1979, however, Southern tendered to plaintiff the amount of the unearned premium.[6] Plaintiff refused to accept that tender.

## C. *The Contentions of the Parties*

In their motion, defendants contend that by the terms of the policy, its coverage did not apply to the July 20, 1976, accident, since Kilrain, who was piloting the helicopter at the time of the accident, did not meet the pilot qualifications stated in the policy endorsement. In opposition to the defendants' motion and in support of his own motion for summary judgment, the plaintiff contends that the pilot qualification endorsement does not limit his coverage and that the defendants are obligated to pay for the loss of his aircraft. He advances a number of distinct arguments: (1) that the endorsement was a modification of the insurance contract reached by the parties by their exchange of telexes on June 22 and 23, 1976, and is void because it was adopted by the defendants unilaterally and without consideration; (2) that the policy is ambiguous and, as it should be construed strictly against the insurer, other provisions which contradict the pilot endorsement are

---

**6.** The amount tendered was $3,054.50. The cancellation clause of the policy provides that the earned portion of the premium (and thereby the amount of the refund) be calculated by "the customary short rate table and procedure" if the insured cancels, and "pro rata" if the company cancels. The amount tendered was computed on the short-rate basis as if the insured had cancelled. If the refund were calculated on a pro rata basis, as plaintiff contends it should have been, the amount of unearned premium would be somewhat larger. The total premium paid by DiSanto for a full 12-months coverage was $3725.00.

controlling; (3) that the defendants are estopped from denying coverage because they unjustly retained the unearned portion of his premium; (4) that the endorsement is contrary to his reasonable expectation and therefore is void; and (5) that the endorsement is inapplicable because Kilrain's failure to meet it was not causally related to the accident.

We will take up first the various arguments asserted by the plaintiff, in the order stated. Finding no merit in any of his contentions, we then turn to the argument of the defendants.

## II. DISCUSSION

### A. *Plaintiff's Motion for Summary Judgment*

#### 1. *Consideration for the Pilot Endorsement*

█ Plaintiff argues first that the telexes of June 22 and 23, 1976, quoted in pertinent part at p. 1355 *supra,* created a binding contract which included no pilot experience or qualification limitations on coverage, and that any subsequent attempt by the defendants to limit or otherwise alter coverage is void for lack of consideration. He contends that the terms of the contract were stated in Trahey's telex of June 22, to which defendants' agent replied, "This is to confirm that we have bound all as per your tel June 22." The June 22 telex provided for a $2000 deductible for in-motion damage, and stated no terms concerning pilot qualifications, while the insurance policy issued on July 1 provided for a $2500 deductible for in-motion damage and included the pilot qualification term quoted at p. 1355, *supra.*[7]

It is plain from the June 22 telex itself, from contemporaneous and subsequent actions of plaintiff's agent Susan Trahey, and from insurance practice, that the June 22 and 23 exchange of telexes was intended by the parties to do no more than to create a "binder," obligating the defendants to undertake insurance coverage beginning from the date of the binder, *i. e.,* June 22, upon policy terms to be fixed in detail shortly thereafter. The June telexes clearly were not intended to state all the terms of the insurance contract, a document which in its final form is ten pages long.

This conclusion follows first from the fact that the June telexes on their face contemplate further dealings between the parties before the final terms of the policy are fixed. Trahey's telex states, "Will transmit our binder and request completed application from insured." Ms. Trahey used the term "binder" here apparently to refer to the Insurance Order Form which was submitted to the defendants. The term is also used in insurance practice to refer to a document memorializing a temporary contract of insurance pending action by the insurer on an application. *See* p. 1358, *infra* (quoting R. Keeton). We have used the term, in accordance with that usage, to refer to the exchange of telexes on June 22 and 23, which similarly expressed a temporary insurance contract. What is important here is that, by its terms, Trahey's contractual offer on behalf of the plaintiff expressly promised the further submission of documents. Harris' confirming telex of June 23 bound the defendants only "as per your tel," *i. e.* within the terms of Trahey's telex, including the submission of further documentation.

On the same day that she sent the telex, June 22, Trahey submitted an "Insurance Order Form." This document proposed a pilot qualification term of the contemplated policy.[8] Since the pilot qualifications were one of the terms of the policy which had not been specified in the agreement by telex, Trahey's transmittal of the Insurance Order Form was a request to supply one of the uncompleted terms of the policy. The Order Form, submitted by plaintiff's agent, again expressly contemplates the submission of still more documentation since it notes that "Completed pilot data and appli-

---

7. The change in the in-motion deductible from $2000.00 to $2500.00 is not relevant to the issues before us and we do not consider it.

8. The term proposed by Ms. Trahey is quoted at p. 1356, *supra.* It is worth noting that Kilrain would not have met even those qualifications, since he did not have 300 hours of helicopter flight experience.

cation will be forthcoming." Plaintiff's application was in fact signed on June 23 and submitted to the defendants.

If it were not clear enough from the telexes themselves and from the Order Form that the parties viewed the pilot qualifications as a term which had been left open in the original exchange of telexes, that conclusion is confirmed by the subsequent action of Trahey when the completed policy was transmitted to her. The defendants did not accept her proposed pilot qualification term, and sent back the completed policy with a cover letter pointing out that a different term had been included in the policy. She in turn advised the plaintiff, "Please note the pilot requirements are different from the ones outlined in our binder." She obviously did not regard it as unusual, or as a breach of the contract made by telex, for the defendants to reject the proposed pilot qualification term and substitute a different term. Plaintiff does not suggest that Trahey's failure to protest the defendants' rejection of her proposed pilot qualification term was the result of inattention to his interests as her client. In the absence of any suggestion that Trahey's acquiescence in the defendants' modification of the proposed pilot term was the result of a lack of diligence in her performance as plaintiff's agent, the only inference which can logically be drawn from her acquiescence is that the pilot term was left open in the June 22 and 23 exchange of telexes, with the understanding that it would be supplied later.

The course of dealings between the parties here conforms to settled practice in the insurance industry. As the Pennsylvania Supreme Court has observed, "temporary contracts of insurance affording coverage pending issuance of the formal policy by the insurer are well known in the insurance industry." *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346, 1348 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). The reasons for this practice have been stated by former Harvard Law School professor, now United States District Judge Robert E. Keeton as follows:

It often happens that there is a substantial interval between the time a policy of insurance is applied for and the time it is issued. . . .

To meet some of the needs during this interval pending action of the insurer on an application, a practice has arisen of making a temporary contract of insurance by a written memorandum of vital terms, other terms of the agreement being ascertainable by reference to sources such as policy forms, rate schedules, and customary practices. . . . With respect to [casualty insurance], these memoranda are often issued in advance of payment of any premium and are usually called "binders."

R. Keeton, Basic Text on Insurance Law 36–37 (1971). *See also* 12 J. Appleman, Insurance Law and Practice § 7221 et seq. (1943 & Supp.1979). In the case before us, the exchange of telexes was the functional equivalent of the customary memoranda. As has been noted, the final policy may be lengthy, containing limitations, conditions, and exclusions which cannot be stated in a telex message (or a short memorandum).

Since the parties left open the pilot qualification term in their original exchange of telexes, there was no need for independent consideration in the form of a reduction or increase of premium for the term subsequently supplied. The June 22 and 23 telexes plainly contemplated that details of the insurance policy which was ultimately issued would be supplied later, in conformity with insurance practice and custom. Accordingly, plaintiff's argument that the pilot endorsement contained in the policy was a modification of the insurance contract reached by the parties in their telex exchange, and that it is void because it was adopted by the defendants unilaterally and without consideration, must fail.

## 2. *Ambiguity of the Policy*

Plaintiff contends that the policy as issued on July 1, 1976, is ambiguous, and that any ambiguity should be construed against the insurer and in favor of coverage for the insured. While the pilot qualification term

of the policy is stated expressly at three different places in the policy, *see* p. 1355, *supra,* plaintiff contends that other provisions of the policy create a reasonable question as to the applicability of the pilot term.

■ Under Pennsylvania law, a provision of a policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning and if alternative or more precise language, if used, would have put the meaning of the language beyond a reasonable question. *Celley v. Mutual Benefit Health and Accident Association,* 229 Pa. Super. 475, 324 A.2d 430 (1974). We stated the rule for construction of ambiguous insurance policies in *Turner v. National Life and Accident Insurance Co.,* 372 F.Supp. 1228, 1230 (E.D.Pa.1974), *aff'd mem.,* 510 F.2d 971 (3d Cir. 1975), as follows:

> If doubt exists as to the meaning of the language used in an insurance policy, that language is to be interpreted favorably to the insured. Nevertheless, where the language of the policy is clear and unambiguous, it cannot be construed to mean otherwise than what it says. It must be given the plain and ordinary meaning of the terms used.

The policy here in question is clear and unambiguous, and the meaning of the language used is already beyond reasonable question.

■ Plaintiff claims to find two ambiguities in the policy. First, he notes that the pilot exclusion, paragraph 2(a) under the heading "Exclusions," is not specifically made applicable to Coverage F, the policy coverage which is relevant here. Some other exclusions are listed under the sub-heading "Under Coverages F, G, H and I (Hull)," but none of the exclusions under that sub-heading deal with pilot qualifications. Plaintiff contends that the insurers' failure to include the pilot exclusion under a sub-heading which specifically references Coverage F renders the policy ambiguous. However, the pilot exclusion is stated under the sub-heading "This policy does not apply and no coverage is afforded," *see* p. 1355, *supra* (quoting exclusion). This language is utterly unambiguous and makes it absolutely clear that the exclusions stated thereunder apply with respect to all coverages afforded by the policy.

■ The second purported ambiguity upon which plaintiff relies is even more strained than the first. Noting that the pilot exclusion denies coverage to an "insured," *see id.,* plaintiff consults the definition of the word "insured" in the "Definitions" section of the policy. That definition provides in (arguably) pertinent part:

> The unqualified term "insured" wherever used in this policy with respect to Coverages A, B, C and D shall include not only the Named Insured, but also any person while using or riding in the aircraft and any person or organization legally responsible for its use, provided the actual use is with the expressed permission of the named insured.

Plaintiff contends that because the policy explicitly defines the word "insured" only with respect to Coverages A, B, C and D, the pilot exclusion, which uses the word "insured," is limited in its scope to those coverages, and is not applicable to Coverage F. While the unconvincing nature of that strained construction should be apparent without further comment, we note (1) the quoted definition enlarges the meaning of the word "insured" with respect to coverages A, B, C, and D, and clearly implies that, except as enlarged, "insured" means "Named Insured" with respect to all other coverages; (2) on the first page of the policy under the heading "Declarations," the plaintiff's name appears over the caption "Name of Insured;" and (3) the word "insured" has a clear "plain and ordinary meaning," *Turner, supra,* which is unaltered by the definition except with respect to coverages A, B, C, and D. We conclude that the policy is wholly unambiguous.

### 3. *Estoppel From Denying Coverage*

Plaintiff contends that the defendants are estopped from denying coverage because they failed to return the unearned portion of his insurance premium before November 1979. He contends that an in-

surer who retains an unearned premium is estopped to deny coverage, citing, *e. g., Central Market Street Co. v. North British & Mercantile Insurance Co.*, 245 Pa. 272, 91 A. 662 (1914). He also appears to suggest that the defendants' failure to return the premium should be construed as an admission that the helicopter was a "total loss" within the meaning of paragraph 25 of the policy Conditions, *see* p. 1356, *supra,* which admission the defendants are estopped from contesting.

■ In order to prove estoppel, the plaintiff must show that he was prejudiced by the defendants' retention of the premium.

> To work an estoppel, there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon. Accordingly, an insurer is not estopped to deny liability on a policy where the plaintiff was not misled by the defendant's conduct.

*Pfeiffer v. Grocers Mutual Insurance Co.*, 251 Pa.Super. 1, 379 A.2d 118 (1977). *Accord, Fedas v. Insurance Company of the State of Pennsylvania*, 300 Pa. 555, 151 A. 285 (1930). Plaintiff argues that he has been prejudiced by the defendants' retention of the unearned premium and by their failure to pay $50,000 for the loss of his helicopter in the July 20, 1976, accident.

Plaintiff misunderstands or misstates the nature of the prejudice which is an essential element of the doctrine of estoppel. To demonstrate the requisite prejudice, plaintiff must show that he acted or refrained from acting in reliance on some conduct of the defendants. For instance, in *Central Market Street, supra,* the insurer accepted premiums with knowledge that the insured had failed to comply with one of the conditions of the policy. If the insurer had refused to accept the premiums, or had refused to continue the policy in effect while the breach continued, the insured could have

remedied the breach or found another insurer. Instead, the insurer by its inaction induced the insured to remain in noncompliance with a condition of the policy. Thus the insured in that case was prejudiced and, the other elements of estoppel being present, the insurer was estopped from denying coverage. Without the element of reliance on some conduct of the party sought to be estopped, the prejudice which is an essential element of estoppel cannot be proved. *Sabino v. Junio,* 441 Pa. 222, 272 A.2d 508 (1971); *ACF Produce, Inc. v. Chubb/Pacific Indemnity Group,* 451 F.Supp. 1095, 1100 n. 2 (E.D.Pa.1978) (Huyett, J.); *see also Commonwealth v. Transamerica Insurance Co.,* 462 Pa. 268, 341 A.2d 74 (1975) (law of waiver).

■ Here, the plaintiff could not have relied on the retention of the premium in any material respect. The defendants' denial of coverage was based solely on the failure of the pilot of the aircraft at the time of the accident to meet the terms of the pilot qualification endorsement in the policy. The retention of the premium occurred only after the time of the accident. Obviously, by that time the plaintiff was powerless to alter the identity of the pilot of the craft. Moreover, the defendants could not have had knowledge of the noncompliance prior to the accident, since that non-compliance only began immediately before the accident when Kilrain began to fly the craft. The mere fact that the defendants retained an unearned premium is not sufficient to create an estoppel against them. We note too, in this regard, that the reason which defendants initially gave for retaining the premium was the pendency of this litigation, *see* p. 1356, *supra,* in which their liability to pay for the loss is in dispute. That is not an unreasonable position.[9] Finally, by pointing to the defendants' failure to pay him for the loss of the helicopter as a form of prejudice, plaintiff in essence makes the argument that the insurers are estopped from denying cover-

**9.** Since the defendants have already tendered a return of the premium, we assume that they will pay the refund promptly after the litigation is concluded. In any event, the return of the premium is not encompassed in the complaint in this action, but has been raised only as an evidentiary matter in support of the plaintiff's motion for summary judgment.

age of the accident because they denied coverage of the accident. This argument is lacking in merit because it is circular.

For all the foregoing reasons, we conclude that the estoppel doctrine is not relevant to this proceeding.

### 4. *Reasonable Expectations of the Insured*

Plaintiff contends that he should be afforded coverage for the accident because he had a reasonable expectation that hull coverage would be afforded him for loss or damage to the helicopter while it was in the custody of a licensed mechanic. He argues that this result is compelled by the reasoning of the Pennsylvania Supreme Court in *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). Defendants reply that the facts of this case are dissimilar to those in *Collister*, and that the extension of *Collister* to the present facts is barred by the recent decision of the court of appeals in *Brokers Title Co. v. St. Paul Fire & Marine Insurance Co.*, 610 F.2d 1174 (3d Cir. 1979).

In *Collister*, the appellant's husband had applied for life insurance and paid a two-month premium in the amount of $60.66. In exchange for that payment, the insurance company's agent gave the husband a "conditional receipt," which stated plainly in bold letters that the insurance would not be effective until the applicant had completed a satisfactory medical examination. *See* 388 A.2d at 1356 (reproducing text of receipt). In addition, the company's agent told the applicant that a medical examination was required; however, the record did not establish that the agent told the applicant orally that coverage would not begin until successful completion of the medical examination. *Id.* 388 A.2d at 1354–55; *cf. id.* 388 A.2d at 1357 (dissenting opinion). The applicant did not obtain a medical examination before his death, but his wife, the appellant before the Court, argued that the insurer's acceptance of his application and premium created a temporary insurance contract notwithstanding the language on the conditional receipt.

The Court viewed the transaction between the appellant's husband and the insurer's agent as a contract of adhesion. *Id.* 388 A.2d at 1350–51. It commented:

> Because the insurer is in the business of writing insurance agreements, the recent trend in insurance cases has been away from strict contractual approaches towards a view that insurance policies (and other insurance contracts) are no longer private contracts in the traditional sense (if they ever were). The traditional contractual approach fails to consider the true nature of the relationship between the insurer and its insureds. Only through the recognition that insurance contracts are not freely negotiated agreements entered into by parties of equal status; only by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot "bargain" over anything more than the monetary amount of coverage purchased, does our analysis approach the realities of an insurance transaction. *See Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977).

*Id.* 388 A.2d at 1353. The Court held:

> The reasonable expectation of the insured is the focal point of the insurance transaction involved here. . . . Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect that they will receive something of comparable value in return for the premium paid.

*Id.* (citation omitted). In order to determine the nature of the reasonable expectations of the insured, the Court examined "the dynamics of the transaction viewed in its entirety:"

> In the instant situation, appellant's husband could reasonably have believed that the "conditional receipt" was what it

purported to be; i. e., a receipt given to evidence that he had paid the first two months premium. Placement on a "receipt" of contract terms and conditions is not a procedure calculated to inform the customer of the content of those terms and conditions, but rather, tends to lull the customer into a failure to observe them. To the ordinary consumer, a receipt is considered only to be evidence that money has been paid as part of the insurance purchasing transaction, and as such is often not taken note of when signed by a trusted advisor in the presence of the consumer. At best, the consumer may possibly glance at the receipt to ascertain that the correct dollar amount has been entered on the blank space provided or that the document is signed by the person receiving the money.

. . .

Appellee also contends that their agent informed appellant's husband that a medical examination was necessary. Appellee has not established by clear and convincing evidence, however, that their agent told the decedent that he was paying money upon application for insurance coverage that would not begin until successful completion of the medical examination. The fact that he informed appellant's husband that a medical examination was required by the insurer does not affect our conclusion therefore.

*Id.* 388 A.2d at 1354–55. Thus the Court found that the insurer had failed to meet its burden of proving that the applicant did not have a reasonable expectation of coverage because, *inter alia*, the company's agent never informed him that he would not be covered and the printed receipt was not an appropriate medium by which the company could inform an average consumer of limitations on coverage.

▉ In the case before us, plaintiff admits, as he must, that the contract was not one of adhesion.[10] In *Brokers Title, supra,* the Third Circuit has analyzed the meaning of the term "contract of adhesion" in the context of insurance contracts, applying

Pennsylvania law. 610 F.2d at 1179–80. The plaintiff in *Brokers Title,* a title insurance company, sought to hold the defendant liable under an "errors and omissions" insurance policy. The defendant refused to pay because, as the district court found, the policy unambiguously excluded coverage for the plaintiff's claim. However, the district court held that the unambiguous exclusionary clause did not apply, following the "reasonable expectations rule" of Pennsylvania law. 466 F.Supp. 1174, 1178 (E.D.Pa.1979). The court found that the defendant's agent had read the exclusion to the plaintiff's president, but had not explained its effect, and that the plaintiff's president misunderstood the effect of the exclusion, although he had never communicated that misunderstanding to the defendant.

The Third Circuit reversed, finding the exclusionary clause fully applicable because the insurance policy was not a contract of adhesion. As the court of appeals noted, "[a]n adhesion contract has been described as 'one which is dictated by a predominant party to cover transactions with many people rather than with an individual, and which resembles an ultimatum or law rather than a mutually negotiated contract.'" 610 F.2d at 1179 (footnote omitted).

The parties in *Brokers Title* were of relatively equal bargaining power; indeed, the insured there was itself in the business of selling insurance, albeit in an entirely different speciality. The court of appeals explained:

The realities of contract negotiations between two parties of relatively equal bargaining position cannot be ignored. There is no evidence that St. Paul [the defendant] would not have issued a policy to Mockler [plaintiff's president] without the exclusionary clause. Had Mockler objected to the clause, and stated so to Murray [defendant's agent], an upward adjustment of the premium undoubtedly could have effectuated its deletion. Moreover, we do not find this particular

---

**10.** Plaintiff's Memorandum Contra Defendants', Southern Marine and Aviation Underwriters, Inc. and Manhattan Fire and Marine Insurance Company Answer and Memorandum to Plaintiff's Cross Motion for Summary Judgment 7 (filed Jan. 15, 1980).

exclusionary clause unfair or oppressive. . . . An errors and omissions policy [with the pertinent exclusionary clause] serves a reasonable business purpose. We do not find such a contract to be unconscionable, contrary to public policy, or incapable of being freely assented to by the purchaser—the three concepts generally asserted for analyzing a contract as one of adhesion.

610 F.2d at 1180 (footnote omitted).

■ In the present case, the pertinent language defining the qualifications of pilots, other than Robert DiSanto, for whom coverage is afforded, is a typewritten addition to the insurance policy. Thus it is not "dictated by a predominant party to cover transactions with many people rather than with an individual." Cf. Brokers Title, supra. The plaintiff negotiated the policy by means of his agent, an experienced insurance broker. While plaintiff suggests that Brokers Title has no application beyond contracts between two insurance companies, we do not believe that the decision can be read so narrowly. Just as in Brokers Title, the plaintiff here was specifically informed of the pilot endorsement, but failed to make any objection. As in Brokers Title, there is no hint in the record that the insurer would not have issued a policy with more liberal pilot qualification standards, or at least negotiated the point in exchange for an adjustment of the premium, if the insured had made his objection known. Finally, as in Brokers Title, the policy actually issued served a reasonable business purpose since it insured against risks of loss whenever the craft was flown by qualified pilots, except insofar as other terms of the policy provided otherwise. Thus it was not unconscionable or contrary to public policy. Presumably, too, the exclusion of coverage when the aircraft was operated by pilots without the requisite experience was reflected in a lower premium.

Since the present action is on all fours with Brokers Title, the "reasonable expectations rule" of Collister, which arose in the context of a contract of adhesion, is inapplicable. We note, however, that even if Brokers Title were not controlling, the reasoning of Collister would not apply here in any event: (1) because the plaintiff was specifically notified of the pertinent term of the policy prior to the accident, and in time to protect his interests had he desired to do so;[11] and (2) because the factual bases for alleged "reasonable expectations" do not measure up to those in Collister.[12]

■ The plaintiff also suggests that another circumstance renders the reasonable expectations rule applicable here. On his application for insurance, plaintiff listed Robert DiSanto as pilot and stated his flight experience in the helicopter as 400 hours. The policy as issued covers Robert

11. He was specifically .informed of the pilot qualification endorsement by the defendants' letter to plaintiff's agent on July 1, 1976, and by his agent's letter to plaintiff himself on July 12, 1976. Moreover, the pilot exclusion was stated unambiguously in three different places in the insurance policy transmitted to plaintiff's agent and to him personally on July 1 and July 12, respectively. While the Collister Court, in examining the dynamics of the transaction before it, found that an ordinary consumer could not be expected to read the printed language on a receipt for payment of his premium, we are unwilling to extend this principle to hold that plaintiff, even if he could be categorized as an ordinary consumer, is not expected to read letters sent to him explaining the limitations on his coverage.

12. We have already discussed the factual circumstances which differentiate the present case from an adhesive contract like that before the Court in Collister. In addition, we perceive no basis upon which plaintiff's expectation that he would be afforded coverage regardless of the qualifications of the pilot, so long as the pilot was a licensed mechanic, can be categorized as "reasonable." Considering "the dynamics of the transaction viewed in its entirety," Collister, supra, 388 A.2d at 1354, we do not deem it reasonable for plaintiff, an experienced businessman employing an insurance broker, to harbor the expectation that he would receive more extensive insurance coverage than that which was expressly provided in the policy. In Collister, by way of contrast, the Court found that it was reasonable for the plaintiff's deceased husband, an unsophisticated consumer, to expect that his life insurance coverage would become effective upon payment of the premium. Obviously, the factual circumstances of this case and of Collister are widely divergent.

DiSanto only if he has 400 hours flight experience—a description which obviously was taken directly from plaintiff's application. However, in his written statement after the accident, Robert DiSanto stated his flight experience as 350 hours. In his deposition, Jasper DiSanto described Robert's flight experience as "three to four hundred hours." Thus it appears that plaintiff Jasper DiSanto's statement on his signed insurance application may have been erroneous,[13] and that the insurance policy might not have covered his loss even if the helicopter had been damaged while Robert DiSanto was the pilot. Plaintiff suggests that these facts demonstrate that pilot qualifications were not a significant factor in the thinking of the DiSantos with respect to their application for insurance. We cannot discern any relevance, however tenuous, of these facts to the issues before us. Even if the reasonable expectations rule were applicable here, we could not hold that it was reasonable for plaintiff to sign an insurance application which he either knew to be erroneous, or could easily have checked and corrected.

We conclude that the reasonable expectations rule is inapplicable in this action, and that even if it were applicable it would not preclude the defendants from denying coverage in these circumstances.

### 5. Causation of the Accident

Plaintiff contends that under Pennsylvania law, the insurer may not deny coverage unless the excluded risk is causally connected to the loss. As we have noted, the defendants concede that Kilrain's failure to meet the terms of the pilot qualification endorsement had no causal relationship with the accident which occurred while he was piloting the craft.

The only Pennsylvania authority cited by plaintiff to support his position is dictum in Weissman v. Prashker, 405 Pa. 226, 175 A.2d 63 (1961). In that decision, which like the case before us involved the loss of an aircraft, the Court held that an exclusion in the insurance policy did not cover conduct in which the pilot was engaged at the time of the crash. After stating that holding, the Court went on to comment that, in any event, the "proximate cause" of the accident was "a maneuver on the part of the pilot which fell entirely outside the scope of the exclusionary provisions." 175 A.2d at 68.

Any inference that the dictum in Weissman makes a causal connection between the excluded risk and the loss necessary under Pennsylvania law is foreclosed by the subsequent decision in Blue Ridge Textile Co. v. Travelers Indemnity Co., 27 D & C 2d 55 (Northampton Co. 1961) (reprinted at 181 A.2d 296–301), aff'd on opinion below, 407 Pa. 463, 181 A.2d 295 (1962). In that case, the Pennsylvania Supreme Court affirmed an opinion which states:

The liability of the insurer under the terms of the contract depended upon the insured's compliance with certain conditions relating to matters material to the acceptance of the risk by the insurer. In the circumstances the fact that there may have been no causal relation between the violation and the loss is wholly without bearing on the question of whether plaintiff breached the conditions.

181 A.2d at 300. Similarly, in this case the terms of the policy do not require a causal link between the pilot qualifications and the accident in order to render the exclusion applicable.[14] Therefore, under Blue Ridge Textile, no such causal link is necessary.

Among decisions in other jurisdictions, there is a split in authority, but the overwhelming majority hold that an insurance exclusion is effective whether or not there is any causal connection between the excluded risk and the loss. E.g., Hollywood Flying Service, Inc. v. Compass Insurance Co., 597 F.2d 507 (5th Cir. 1979) (Florida law); Arnold v. Globe Indemnity Co., 416 F.2d 119 (6th Cir. 1969); Bruce v. Lumber-

---

**13.** In his own deposition, however, Robert DiSanto testified that he had more than 400 hours of flight experience at the time of the accident.

**14.** Furthermore, as in Blue Ridge Textile, compliance with the condition at issue (the pilot qualification clause) was material to acceptance of the risk by the insurer.

*mens Mutual Casualty Co.*, 222 F.2d 642 (4th Cir. 1955); *Aetna Casualty & Surety Co. v. Urner*, 264 Md. 660, 287 A.2d 764 (1972); *Macalco, Inc. v. Gulf Insurance Co.*, 550 S.W.2d 883, 893 (Mo.App.1977); *Omaha Sky Divers Parachute Club, Inc. v. Ranger Insurance Co.*, 189 Neb. 610, 204 N.W.2d 162 (1973); *Schepps Grocer Supply, Inc. v. Ranger Insurance Co.*, 545 S.W.2d 13 (Tex. Civ.App.1976). As some of these courts have observed, a contrary result would amount to judicial rewriting of the contract between the parties. Moreover, as the Maryland Court of Appeals suggested in *Urner, supra*, the breadth or narrowness of the policy exclusions will presumably be reflected in the premium paid by the insured. 287 A.2d at 768. Nevertheless, a few courts have held, on varying rationales, that an insurance exclusion or warranty does not limit coverage unless it is causally related to the loss. *Avemco Insurance Co. v. Chung*, 388 F.Supp. 142 (D.Haw.1975) (Hawaii law); *Benton Casing Service, Inc. v. Avemco Insurance Co.*, 379 So.2d 225 (La.1979) (Louisiana statute); *South Carolina Insurance Co. v. Collins*, 269 S.C. 282, 237 S.E.2d 358 (1977). Of course, we need not consult the reasoning of courts in other jurisdictions in any event, since *Blue Ridge Textile, supra*, is controlling.[15]

We conclude that the absence of a causal link between the pilot qualification term of the insurance policy and the accident of July 20, 1976, does not affect the applicability of the pilot exclusion. Since we have now rejected each of plaintiff's legal arguments, plaintiff's motion for summary judgment will be denied. We turn to defendants' motion.

### B. Defendants' Motion for Summary Judgment

The defendants' motion for summary judgment is grounded on the plain lan-guage of the policy, which is quoted in pertinent part at p. 1356, *supra*. We agree that the plain language of the policy requires judgment in favor of the defendants. None of the arguments which the plaintiff has advanced to avoid this result is persuasive, and we have considered and rejected each of those arguments in turn.

While this result may appear harsh, since it is mere circumstance that the accident occurred while the craft was piloted by a licensed mechanic who did not meet the terms of the policy, we agree with Judge Troutman who, in denying insurance coverage to a plaintiff who had been permanently injured in a motorcycle accident, said:

> Considering Taylor's serious and permanent condition and the cost of treatment and rehabilitation, natural feelings and instincts dictate that every effort be made to ease his burdens. But public policy does not so dictate. Rather, public policy dictates that legitimate and unambiguous contracts entered into without fraud, duress, coercion or improper conduct shall be fairly interpreted and enforced.

*Taylor v. Phoenix Mutual Life Insurance Co.*, 453 F.Supp. 372, 380 (E.D.Pa.1978).

An appropriate order follows.

---

**15.** In pure policy terms, there are a number of countervailing considerations which come into play on the question whether the causation rule which plantiff proposes is the better rule. Among these are risk spreading, predictability, and the cost of litigation over the causation question. If the proposed rule requiring insurance companies denying coverage to prove causation is the better rule on policy grounds, it seems to us that the plaintiff's appropriate forum is the Pennsylvania legislature.